Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000950
17-APR-2020
07:46 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---oOo---

STATE OF HAWAIʻI, Plaintiff-Appellant,
v.
ALIK LUKE, Defendant-Appellee

NO. CAAP-15-0000950

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 15-1-0589)

April 17, 2020

GINOZA, CHIEF JUDGE, FUJISE AND CHAN, JJ.

OPINION OF THE COURT BY GINOZA, CHIEF JUDGE

This appeal arises from a jury trial in the Circuit Court of the First Circuit (**Circuit Court**)[1] in which Plaintiff-Appellant State of Hawaiʻi (**State**) alleged that Defendant-Appellee Alik Luke (**Luke**) committed, *inter alia*,[2] the following

---

[1] The Honorable Rom A. Trader presided.

[2] Luke was also charged with Count IV, Promoting a Dangerous Drug in the Third Degree in violation of HRS § 712-1243, and Count V, Prohibited Acts Related to Drug Paraphernalia in violation of HRS § 329-43.5(a). The State
(continued...)

offenses: Count I, Attempted Burglary in the First Degree in violation of Hawaii Revised Statutes (**HRS**) §§ 705-500 (2014)[3] and 708-810(1)(c) (2014);[4] Count II, Burglary in the First Degree in violation of HRS § 708-810(1)(c); and Count III, Unauthorized Possession of Confidential Personal Information in violation of HRS § 708-839.55 (2014).[5]

---

[2](...continued)
moved to *nolle prosequi* Count IV, and the Circuit Court granted Luke's motion for judgment of acquittal on Count V.

[3]  HRS § 705-500 states:

> **§705-500 Criminal attempt.**  (1) A person is guilty of an attempt to commit a crime if the person:
> (a)  Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
> (b)  Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
> (2)  When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
> (3)  Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

[4]  HRS § 708-810(1)(c) states:

> **§708-810 Burglary in the first degree.**  (1) A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:
>
> .  .  .  .
>
> (c)  The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

[5]  HRS § 708-839.55 states:

> **[§708-839.55] Unauthorized possession of confidential personal information.**  (1) A person commits the offense of unauthorized possession of confidential personal information if that person intentionally or knowingly possesses, without
> (continued...)

2

A jury trial ultimately concluded with the Circuit Court declaring a mistrial due to comments by the prosecutor in rebuttal closing argument identifying Luke as the source for information about a "cousin Jeff", which violated the Circuit Court's prior evidentiary ruling that Luke's statements were inadmissible.

Given the mistrial, Luke filed "Defendant's Motion to Dismiss with Prejudice" (**Motion to Dismiss**) seeking dismissal of Counts I through III <u>with</u> prejudice. The Circuit Court granted dismissal with prejudice after considering the factors discussed in <u>State v. Moriwake</u>, 65 Haw. 47, 647 P.2d 705 (1982) and entered its "Findings of Fact, Conclusions of Law, and Order Granting Defendant's Motion to Dismiss with Prejudice" (**Dismissal Order**). An important part of the Circuit Court's <u>Moriwake</u> analysis was that the State had failed to present sufficient foundation to admit surveillance videos from the residence where Luke allegedly committed the burglary offense.

On appeal, the State contends that the Circuit Court erred in dismissing the case with prejudice. The State asserts that in dismissing with prejudice, the Circuit Court's Findings of Fact (**FOF**) 8, 11, and 13 were clearly erroneous; and the Circuit Court's Conclusions of Law (**COL**) 5, 7, 8, 9, 10, 12 and its evaluation of the factors set forth in <u>Moriwake</u> were wrong.

We conclude the Circuit Court erred in its analysis in precluding surveillance videos taken at the residence Luke is alleged to have burglarized. In turn, because the Circuit Court relied heavily on the State's failure to obtain admission of

---

[5](...continued)
        authorization, any confidential personal information of another in any form, including but not limited to mail, physical documents, identification cards, or information stored in digital form.
        (2) It is an affirmative defense that the person who possessed the confidential personal information of another did so under the reasonable belief that the person in possession was authorized by law or by the consent of the other person to possess the confidential personal information.
        (3) Unauthorized possession of confidential personal information is a class C felony.

those surveillance videos in ruling under <u>Moriwake</u> to dismiss this case with prejudice, we conclude that the Circuit Court abused its discretion in dismissing this case with prejudice.

We thus vacate the Dismissal Order and remand the case for further proceedings.

## I.   Background

The State's charges against Luke are based on an investigation conducted by the Honolulu Police Department (**HPD**) of an alleged attempted burglary of the residence of Cindy and Derek Yamamoto (**the Yamamotos**), and an alleged burglary of the residence of Lori Kohara (**Kohara**) and Kyle Shimoda (**Shimoda**), which led to Luke's arrest.  When arrested, Luke was allegedly in possession of items that implicated his involvement in the alleged burglary of the Kohara/Shimoda residence, including a suitcase belonging to Kohara and Shimoda that was taken from their residence containing various personal effects and Shimoda's credit cards, a purple backpack containing more items belonging to Kohara and Shimoda, and a jacket holding certain items identified as Kohara and Shimoda's property.

### A.   Jury Trial

At trial, the State attempted to proffer evidence against Luke, including: (1) evidence of statements made by Luke to an HPD officer at the time he was detained; (2) video evidence recorded by the Yamamotos' security system which allegedly recorded Luke in the backyard of the Yamamoto residence during the alleged attempted burglary (**Yamamoto Video**); (3) video evidence recorded by the security system at Kohara and Shimoda's residence showing a person entering their property and leaving with a suitcase (**Shimoda Videos**); and (4) evidence of Luke's possession of various items at the time of his arrest.

### 1.   Luke's Statements About Cousin Jeff

Prior to jury selection, the Circuit Court heard Luke's motion in limine, including Luke's Evidentiary Request No. 6 (**Request no. 6**), "Exclusion of Involuntary Confessions".  In Request no. 6, Luke sought an order excluding from evidence any

statements that he allegedly made when he was detained by an HPD officer on the day of the alleged offenses.

At the hearing on Luke's motion in limine, the State asserted that Luke's statements in question were spontaneous utterances made to HPD Corporal Edlin Kam (**Officer Kam**). The State represented that such utterances included statements such as "oh, I don't know who this suitcase that I'm holding belongs to", "I just saw the battery in the guy's yard", "I was looking at the battery", and "you're stopping me because he saw me." The State also acknowledged Luke's assertion that Luke had also "said something about cousin Jeff at a storage locker[.]" The Circuit Court took Request no. 6 under advisement subject to a hearing on the voluntariness of these statements.

The Circuit Court later conducted a voluntariness hearing on whether Luke's alleged statements to Officer Kam would be admissible. At the hearing, Officer Kam testified that on April 13, 2015, at approximately 11:30 AM, he responded to a burglary case reported in the Kapahulu area. Officer Kam was apprised by the initial responding officer of the details of the alleged attempted burglary, and was given a description of the suspect. Officer Kam then testified that he patrolled the nearby area in search of an individual that matched the description given to him.

Officer Kam testified that during this search he observed a male in the nearby area who matched the physical description of the suspect. Officer Kam observed the individual trying to cross the street towards a public storage facility. Officer Kam testified that he proceeded to stop the individual and asked him for his name and identification. The individual provided Officer Kam with his name but was not able to produce any form of identification.

Officer Kam then testified that the individual spontaneously uttered: "I didn't take anything", "[I] was looking at this car battery that was there". Officer Kam asked Luke where he was going, to which Luke responded he was "going to meet

his cousin at the Public Storage". Officer Kam then indicated that before he could ask Luke about the bags in his possession, Luke uttered "this is not my bag, this is not my luggage." Officer Kam then identified Luke in court as the individual he had stopped that day and who had made such utterances.

On cross-examination in the voluntariness hearing, Officer Kam testified that he was in an HPD vehicle and was wearing an HPD uniform at the time he stopped Luke. Officer Kam further testified that before Luke made any statements, Officer Kam had verbally related to Luke that he was being stopped because he was a suspect in a burglary case. Officer Kam also acknowledged that at some point during the stop he asked Luke where he was going. Officer Kam indicated that at the time he stopped Luke, he believed that he had enough information to hold Luke until a witness could potentially identify Luke, and at that point of his investigation he was not going to let Luke leave the area.

Based on Officer Kam's testimony in the voluntariness hearing, the Circuit Court granted Luke's Request no. 6 and precluded the State from introducing into evidence Luke's alleged statements.

Although the State was precluded from introducing Luke's alleged statements to Officer Kam, the possible existence of a "cousin Jeff" was later introduced at trial by Luke's defense counsel in his cross-examination of HPD Detective Jon Yoshida (**Detective Yoshida**), the lead investigator for the case, and Officer Kam. During cross-examination, Detective Yoshida was questioned extensively on whether any follow-up investigation had been conducted at the public storage facility for a cousin Jeff. Detective Yoshida testified that the possible existence of a cousin Jeff was not brought to his attention. Detective Yoshida thus indicated that no follow-up investigation was ordered and no HPD officers were sent to the public storage facility to collect any evidence, including evidence relating to the existence of a cousin Jeff. Officer Kam also testified under cross-examination

that he did not conduct any further investigation at the public storage facility and did not search for a cousin Jeff as part of his investigation. In the cross-examination of both Detective Yoshida and Officer Kam, Luke's counsel specifically instructed both witnesses to address his questions relating to cousin Jeff without speaking to the source of that information, i.e. Luke's statements to Officer Kam.

## 2. Evidence of attempted burglary at Yamamoto residence

During trial, the State presented testimony by Derek Yamamoto (**Yamamoto**), an occupant of the residence that Luke had allegedly attempted to burglarize and who had reported the incident to HPD. Yamamoto testified that he was inside his residence and was on a conference call at the time of the incident. In response to receiving an e-mail, Yamamoto testified that he walked to his kitchen and looked into his backyard through the jalousie windows in his back exterior door. Yamamoto testified that he saw a silhouette of a person through the window, which prompted him to yell out to the person "something like[,] what are you doing?" Yamamoto testified that the individual was startled, and said "something like[,] oh", and then left the premises.

After observing the unidentified person in his backyard, Yamamoto called 911 and reported that someone had tried to break into his residence. Yamamoto then accessed the video footage recorded by his security system to describe to the 911 operator the physical description of the person who had entered his backyard, including the clothing the person was wearing. Yamamoto testified that HPD officers arrived at his residence in response to his 911 call and eventually drove him to a public storage facility nearby to identify a suspect who matched the description provided by Yamamoto. After seeing the suspect at the public storage facility, Yamamoto indicated to the HPD officers that the individual appeared to be the same person that he saw in his surveillance footage. Yamamoto then identified Luke in the courtroom as the person he saw in the surveillance

footage and the person he saw through his window on the day of the incident. Yamamoto testified that nothing was taken from his residence that day.

The State then proceeded to examine Yamamoto on the surveillance footage captured by his security system that he had provided to HPD. Yamamoto explained that he had purchased the system online and installed it himself. The system consisted of one camera, and was situated in his backyard facing the back gate. Yamamoto testified that the camera is always on, and that it records when it detects motion. If the motion continues, Yamamoto explained that the security system sends him an e-mail that is accompanied with a still-frame of the video recording.

Yamamoto further testified that only he and his wife have access to the recorded data, which they can access from either their computer or mobile devices. Yamamoto indicated that the security system has a date-stamp capability which synchronizes the time with a standard time server that ensures that the correct time is referenced in each recording. Yamamoto testified that the security system does not require daily maintenance, and he has never had to fix or call anyone to repair the system.

The State then attempted to admit into evidence the Yamamoto Video, which Yamamoto identified as a copy of the security video he had provided to the police. Luke objected based on lack of foundation, State v. Manewa, 115 Hawai'i 343, 167 P.3d 336 (2007),[6] and State v. Assaye, 121 Hawai'i 204, 216

---

[6] In Manewa, the Hawai'i Supreme Court held that evidence regarding the weight of methamphetamine was inadmissible because there was insufficient foundation to show that the "analytic balance" used to weigh the methamphetamine was in proper working condition. 115 Hawai'i at 345, 354-57, 167 P.3d at 338, 347-50. The supreme court reasoned that the testimony of an HPD criminalist (Mohammed), who had analyzed and examined the drug evidence, was insufficient to establish the reliability of the analytic balance because:

> the evidence failed to establish (1) that Mohammed had any training or expertise in calibrating the balance, (2) that the balance had been properly calibrated by the manufacturer's service representatives, (3) that there was an accepted manufacturer's established procedure for "verify[ing] and validat[ing]" that the balance was in
> (continued...)

P.3d 1227 (2009),[7] to which the Circuit Court sustained only "based upon the lack of foundation at this point." After additional failed attempts to admit the exhibit, the State requested permission to recall Yamamoto at a later time to establish the foundation for the Yamamoto Video to the court's satisfaction. After hearing arguments from both counsel on the State's request, the Circuit Court allowed the State to recall Yamamoto for the limited purpose of further questioning on the Yamamoto Video itself, and allowed Luke to reserve the entirety of his cross-examination pending completion of Yamamoto's testimony.

Subsequently, by agreement of the parties, the Circuit Court conducted a hearing pursuant to Hawai'i Rules of Evidence (**HRE**) Rule 104 (2016) to determine the admissibility of the Yamamoto Video.[8] At the HRE Rule 104 hearing, Yamamoto testified that he had personal knowledge that his security system was operating and performing properly on the day of the incident.

---

[6](...continued)
proper working order and that if such a procedure existed, that Mohammed followed it, and (4) that his balance was in proper working order at the time the evidence was weighed.

Id. at 354, 167 P.3d at 347.

[7] In Assaye, the Hawai'i Supreme Court relied on Manewa in holding that the testimony of a police officer did not provide proper foundation for admission of a speed reading from a laser gun. 121 Hawai'i at 210-14, 216 P.3d at 1233-37. In this regard, Assaye noted that although the police officer testified that he conducted four tests prior to his shift to determine that the laser gun was working properly, "Manewa requires the prosecution to prove that the four tests conducted by [the officer] were procedures recommended by the manufacturer for the purpose of showing that the particular laser gun was in fact operating properly on [the date of the alleged offense]." Id. at 212, 216 P.3d at 1235.

[8] The HRE 104 hearing was conducted outside the presence of the jury. HRE Rule 104(a) states:

**Rule 104. Preliminary questions.**
**(a) Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b). In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

Yamamoto testified that prior to the incident, he had received multiple e-mail notifications from his security system when his wife and he had gone into the backyard on separate occasions earlier that day, indicating that the system was functioning properly. Likewise, Yamamoto testified that the e-mail notification he received that day which displayed an image of an unidentified individual in his backyard was consistent with his own subsequent inspection of his backyard where he saw Luke. Yamamoto further testified that he had provided a copy of his security video to HPD, and that the contents of the video were accurately reflected in the Yamamoto Video.

On cross-examination, Yamamoto testified that he was not employed by the manufacturer of the security system and was not a technician trained in the use of the security system. Yamamoto indicated that the security system was a consumer-level device, and that the system had never been calibrated by a technician since it had been purchased. Yamamoto also testified that one feature of the security system is that it stamps the date and time of the video when it records.

After hearing arguments from the parties on the admissibility of the video, the Circuit Court determined that Yamamoto's testimony provided sufficient foundation for the Yamamoto Video to be entered into evidence. The Circuit Court disagreed with Luke's argument that the security system was akin to a measuring device as discussed in Manewa, and ultimately concluded that "at its core", the Yamamoto video "is simply a video from a system that was installed by this witness." The Circuit Court noted that while Yamamoto was not an expert relating to the design or maintenance of the security system, he was still able to establish the reliability of the device, specifically referring to Yamamoto's testimony about e-mail notifications he received the day of the incident. The Circuit Court thus admitted the Yamamoto Video into evidence and it was published to the jury.

### 3. Hearing on admissibility of Shimoda Videos

The Circuit Court also held an HRE Rule 104 hearing to determine the admissibility of the Shimoda Videos. The Shimoda Videos contain surveillance footage provided to HPD which allegedly showed a person enter and leave the Kohara/Shimoda property on the day of the incident.

At the hearing, the State attempted to admit the Shimoda Videos through the testimony of Shimoda, one of the owners and occupants of the Kohara/Shimoda residence. Shimoda testified that on the day of the incident his home was equipped with a Cam Security surveillance system that was installed by a Cam Security technician in September 2013. The security system includes four cameras situated in various parts of the property that are never turned off and are constantly recording. Shimoda explained that he is able to monitor the footage of all four cameras through a fifty-inch screen that is broken into four quadrants, each showing the view from one camera. Shimoda further testified that one indication of when a camera is not functioning properly is when its corresponding quadrant on the screen turns blank or blue and fails to display an image. Shimoda indicated that on the day of the incident, three of the four cameras were functioning, and that the fourth camera typically did not function in the daylight.

Shimoda testified that a Cam Security technician was called to his house on the day of the incident to assist in downloading the relevant video footage for the purpose of turning it over to HPD. Shimoda indicated that a Cam Security technician had performed maintenance on the security system on two occasions prior to the incident, but Shimoda had not experienced any problems since the device was last serviced. Shimoda also testified about the types of things that would indicate if the system was not operating properly.

The State then attempted to elicit testimony from Shimoda on whether he knew if the security system was operating properly on the day of the incident, however each time the

question was posed the Circuit Court sustained Luke's objection based on lack of foundation.  The State requested that the Circuit Court instruct Luke's counsel to provide the factual basis for his objection so that the State could properly address the objection.  The Circuit Court declined to do so, stating that if the court or Luke were to provide such information, it would be giving the State an indication as to the information necessary to lay foundation for the Shimoda Videos.  The Circuit Court also admonished the State, noting that the prosecutor was a very experienced trial lawyer who is aware of the rules of evidence, case law, and other authority which might speak to the admissibility of the evidence, and it is up to the State to establish sufficient foundation to have the videos admitted.

The State proceeded to further question Shimoda. Shimoda testified he was notified about a problem at his house when he received a call from a police officer at about 12:50 p.m. while at his office.  Shimoda immediately left his office to meet police by a public storage facility near his home, where he identified various items as belonging to him or Kohara, including a black suitcase.  Shimoda then went to his house where other police officers met him.  After going through his house and noticing some things missing and some things moved around, Shimoda checked his security system.  He played footage from earlier that day and watched the video with several police officers and family members.  Shimoda testified that the security system had recorded a person entering his property at approximately 11:20 a.m. on the day of the incident, Shimoda described what the person was wearing, and that the person had proceeded towards the back of his house.  Shimoda further testified that at approximately 11:50 a.m., the same person was recorded leaving the front door with Shimoda's black suitcase, which Shimoda last saw when he had left for work.

Shimoda testified that he called a Cam Security technician who came to his house at about 1:30 or 2:00 p.m. the afternoon of the incident, who downloaded the relevant footage

from the security system to provide to HPD for their investigation. Shimoda testified that he reviewed the Shimoda Videos prior to trial and they were identical to the footage he viewed on the day of the incident.

The State then attempted to offer the Shimoda Videos into evidence, but Luke objected based on "[f]oundation, confrontation, hearsay, State v. Manewa, State v. Assaye". The Circuit Court sustained the objections without further comment. The Shimoda Videos were not admitted into evidence.

### 4. Items in Luke's possession

At trial, the State presented evidence that Luke possessed various items at the time of his arrest which implicated his involvement in the alleged offenses. Officer Kam testified that when Luke was detained, he possessed a black suitcase, a purple backpack, and a laminated luggage card with the contact information for Shimoda and Kohara. The State also offered the testimony of HPD Officer William Choi (**Officer Choi**), one of the HPD officers present at the public storage facility when Luke was detained the day of the incident. Officer Choi testified that while monitoring Luke at the public storage facility, he recovered a check made out to Kohara which had blown free from one of the bags that was in Luke's possession during his arrest.

Detective Yoshida testified to the evidence collected on the day of the incident, which included a black suitcase, a purple backpack, a black fanny pack, and a gray colored jacket. Detective Yoshida indicated that the black suitcase had a luggage tag with Kohara's name attached to it, and it was taken to Detective Yoshida's office and examined in the presence of Shimoda and Kohara on the evening of the incident. At trial, Kohara and Shimoda testified that they reviewed the contents of the black suitcase and that it contained various personal effects, clothing, and jewelry that they identified as their property. The items also included numerous credit cards belonging to Shimoda that were previously stored in his home.

Kohara confirmed that the check recovered from the arrest scene was made out and belonged to her. Kohara also testified that all items that were taken from their home were recovered except for a pair of jade earrings.

Detective Yoshida testified to the contents of the purple backpack, black fanny pack, and gray jacket. Detective Yoshida testified that the black fanny pack contained various hand tools which Kohara and Shimoda indicated did not belong to them. There were also other items recovered in the purple backpack that did not belong to Kohara or Shimoda. However, Detective Yoshida identified various personal effects recovered from the purple backpack and gray jacket which were later identified as property of Shimoda and Kohara.

On cross-examination, Detective Yoshida indicated that no form of identification was recovered from the purple backpack and black fanny pack that could link the items to Luke or a cousin Jeff. Detective Yoshida also indicated that there was no fingerprint or DNA evidence that linked the recovered items to Luke. Detective Yoshida also acknowledged that Kohara and Shimoda may not have recovered all of the items that were allegedly taken from their home during the incident.

### 5. Closing arguments and mistrial

After the State rested its case, Luke opted not to present any evidence and rested. During closing argument, Luke's counsel emphasized to the jury that the State was only able to present circumstantial evidence that he had entered the Shimoda/Kohara residence, and although Luke had possessed their property when he was arrested, there was no evidence that established how Luke had obtained those items. Luke's counsel then commented on the existence of a cousin Jeff stating, in relevant part:

> Detective Yoshida told you it's [his] job to gather all the evidence. It wasn't brought to his attention, but at some point in the investigation, Officer Kam learned of cousin Jeff, going to meet at the storage facility. What is cousin Jeff? Is he an accomplice? Did he enter Shimoda and Kohara's place? We don't know.

Luke's counsel went on to further comment that there was no fingerprint or DNA evidence that established that Luke had entered the Shimoda/Kohara residence, or that he had even handled the stolen items. Luke's counsel further emphasized that not all of the missing items were returned to Kohara and Shimoda, which inferred the involvement of an accomplice or second party, and created reasonable doubt as to whether Luke had entered the Kohara/Shimoda residence. Luke's counsel also argued there was no evidence to establish that Luke knew the contents of the bag he possessed when arrested, including Shimoda's credit cards.

In the State's rebuttal, the prosecutor attempted to respond to Luke's closing argument by asserting that it was Luke who raised the existence of cousin Jeff's involvement in the alleged offenses.

> The puka, [Luke's] trying to create for you. What do I mean by that? Let me be more specific. Where do we hear about cousin Jeff? We hear about cousin Jeff from who? This guy. The only person that we --"

The Dismissal Order states, and it is uncontested, that the prosecutor pointed at Luke when making this statement. Luke moved for a mistrial immediately following this statement, asserting that the State impermissibly introduced Luke's precluded statements pertaining to the existence of cousin Jeff.

The Circuit Court granted Luke's motion for mistrial, noting that the State's rebuttal argument directly contravened the court's earlier ruling on Luke's Request no. 6 which precluded the State from introducing any statements made to HPD at the time of Luke's arrest, including Luke's statements regarding cousin Jeff. The Circuit Court noted that the State had injected evidence into the case that was not received.

The Circuit Court stated that Luke was "essentially forced" to raise this motion for mistrial, and further commented on the possibility of a retrial and that the court would need to consider precluding the Shimoda Videos as a sanction in any retrial.

> I have not ruled at all on any type of -- and formulated in my mind that any motion that might be brought

15

> in the future to dismiss will be denied and there is automatically in my mind a opportunity for retrial in this case. But among the things that I think I need to consider is if that were to come to pass -- and I'm essentially telling you now so that you're not unaware, is that given the circumstances here, if the court were to somehow find it appropriate to permit a retrial in this case, to do so and potentially benefit from the mistrial under these circumstances such that additional evidence that the State sought to introduce, <u>namely, the video from the Kohara/Shimoda burglary</u> may be introduced, I would have to say that among the things that I think would be appropriate to consider is whether or not a retrial, that as a sanction that the court could look at the exclusion of that based upon its rulings in this case but, more importantly, based upon the circumstances under which the mistrial occurred.

(Emphasis added).

### B. Luke's Motion to Dismiss With Prejudice

Luke subsequently filed his Motion to Dismiss asserting that Counts I through III should be dismissed with prejudice pursuant to <u>Moriwake</u>, 65 Haw. 47, 647 P.2d 705 and <u>State v. Hinton</u>, 120 Hawaiʻi 265, 204 P.3d 484 (2009), and due to prosecutorial misconduct under <u>State v. Rogan</u>, 91 Hawaiʻi 405, 984 P.2d 1231 (1999). The Circuit Court granted Luke's Motion to Dismiss with prejudice based on the factors in <u>Moriwake</u>, while also ruling that the State's conduct did not rise to the level of egregiousness in <u>Rogan</u>. The Circuit Court entered its Dismissal Order, dismissing Counts I through III with prejudice.

### II. Standards of Review

### A. Motion to Dismiss Indictment

"A trial court's application of <u>State v. Moriwake</u> to a motion to dismiss an indictment is reviewed for an abuse of discretion." <u>State v. Deedy</u>, 141 Hawaiʻi 208, 214, 407 P.3d 164, 170 (2017) (citing <u>Hinton</u>, 120 Hawaiʻi at 278-80, 204 P.3d at 497-99).

> The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. The burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it.

<u>State v. Deguair</u>, 136 Hawaiʻi 71, 84-85, 358 P.3d 43, 56-57 (2015) (quoting <u>Hinton</u>, 120 Hawaiʻi at 273, 204 P.3d at 492).

### B. Findings of Fact and Conclusions of Law

Regarding challenges to the Circuit Court's Findings of Fact and Conclusions of Law:

> A trial court's FOF are reviewed under the "clearly erroneous" standard. A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. An appellate court may freely review conclusions of law and the applicable standard of review is the right/wrong test. A conclusion of law that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned.

Dan v. State, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994) (citations and some quotation marks omitted). We note however, that our review of the Circuit Court's conclusions in evaluating the Moriwake factors is reviewed for an abuse of discretion, as previously noted. Deedy, 141 Hawai'i at 214, 407 P.3d at 170.

### III. Discussion

### A. FOFs 8 and 13 Were Not Clearly Erroneous

In its first point of error, the State challenges FOFs 8, 11, and 13 in the Circuit Court's Dismissal Order.

### 1. FOF 8

FOF 8 states:

> Two of the State's witnesses, Detective Jon Yoshida and Officer Kam were cross-examined by the Defense about their investigation of Cousin Jeff and whether he was at the storage facility, or had been there, and both testified that there had been no follow-up to look for Cousin Jeff, verify whether he'd been at the public storage facility, or even determine if he was a real person.

FOF 8 is not clearly erroneous because it accurately characterizes the evidence adduced from Luke's cross-examinations of Detective Yoshida and Officer Kam.[9] As discussed above, Luke had questioned both Detective Yoshida and Officer Kam on whether an investigation was conducted about cousin Jeff at the public storage facility on the day of the incident. Detective Yoshida testified that his officers did not bring the existence of cousin

---

[9] The State does not challenge the cross-examination of the officers about cousin Jeff, even though Luke's statements about cousin Jeff were deemed inadmissible.

Jeff to his attention, and as such no follow-up investigation was conducted. Likewise, Officer Kam testified that he was never instructed by his superiors to investigate the public storage facility or to search for a cousin Jeff. Thus, FOF 8 accurately characterizes the evidence.

As Luke points out on appeal, the fact that HPD did not investigate the possibility of a cousin Jeff being involved was precisely what Luke's trial counsel was attempting to elicit in his cross-examination of Detective Yoshida and Officer Kam, because it arguably raised reasonable doubt whether Luke was guilty of Counts I through III.

FOF 8 is not clearly erroneous.

## 2. FOF 13

FOF 13 states:

> However, all the confidential personal information of Mr. Shimoda, such as his credit cards, was inside Shimoda's closed luggage container, and there were no fingerprints, DNA evidence, video footage, eyewitnesses, or any other evidence showing that the Defendant had entered Shimoda's dwelling to acquire the luggage and other property he possessed when he was arrested, or that he was aware of the contents of the luggage.

The State asserts that FOF 13 is clearly erroneous because there was "other evidence" presented at trial that showed that Luke was the individual who entered the Kohara/Shimoda residence and intentionally possessed the contents of the black suitcase, including Shimoda's credit cards. Specifically, the State asserts that Luke's possession of the items alone was compelling circumstantial evidence to support Luke's conviction in counts II and III.

The State however, ignores the Circuit Court's FOF 12, which explicitly acknowledges such evidence:

> Without the Shimoda recordings, the only evidence the State presented in support of Counts II and III was the fact that the Defendant was in possession of the stolen property of Mr. Shimoda and his wife when he was arrested.

FOF 13, taken in conjunction with FOF 12, accurately characterizes the evidence adduced at trial and is not clearly erroneous.

18

## B. FOF 11: Error Regarding the Shimoda Videos

FOF 11 states:

> During the trial the State also attempted to introduce two video recordings from Complainant Kyle Shimoda's security camera, but was unable to lay foundation for them during a hearing outside the presence of the jury.

The State contends that FOF 11 is erroneous because the necessary foundation was established for admission of the Shimoda Videos during the HRE Rule 104 hearing.

"When a question arises regarding the necessary foundation for the introduction of evidence, the determination of whether proper foundation has been established lies within the discretion of the trial court, and its determination will not be overturned absent a showing of clear abuse." State v. Eid, 126 Hawaiʻi 430, 440, 272 P.3d 1197, 1207 (2012) (citation omitted); see also State v. Torres, 60 Haw. 271, 275-76, 589 P.2d 83, 86 (1978) (noting x-ray photographs are similar to ordinary photographs and "[w]hether or not an x-ray photograph has been sufficiently verified so as to warrant its admission in evidence is a matter within the sound discretion of the trial judge." (citations omitted)). "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party-litigant." State v. Loa, 83 Hawaiʻi 335, 349, 926 P.2d 1258, 1272 (1996) (citation and internal quotation marks omitted).

Here, the Circuit Court's decision not to admit the Shimoda Videos was a significant factor in the court's decision to dismiss the case with prejudice after declaring a mistrial. Thus, whether the Circuit Court abused its discretion in precluding admission of the Shimoda Videos is important to whether it erred in dismissing the case with prejudice.

Based on our review of the record, we conclude that the Circuit Court abused its discretion by applying the wrong analysis in deciding to preclude admission of the Shimoda Videos.

19

HRE Rule 901 (2016) provides, in relevant part:

**Rule 901 Requirement of authentication of identification.**
**(a) General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
**(b) Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
> **(1) Testimony of witness with knowledge.** Testimony that a matter is what it is claimed to be.
> . . .
> **(9) Process or system.** Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

This court has previously recognized that under HRE Rule 901(b)(1), "photographic or video evidence can be authenticated by testimony demonstrating that the evidence correctly represents what it is claimed to represent, regardless of the technical details involved in recording the evidence." State v. Hufanga, No. CAAP-17-0000737, 2019 WL 1487047, at *4 (App. Apr. 4, 2019) (SDO) (citing also Territory of Hawaii v. Hays, 43 Haw. 58, 65 (Haw. Terr. 1958)).[10]

In this case, regarding the Shimoda Videos, HRE Rule 901(b)(9) is applicable, rather than HRE 901(b)(1). In this regard, other jurisdictions have recognized the "silent witness" theory and allowed the admission of a video or photograph where there is no first-hand witness to the event or matter captured by the video or photograph. As explained by the Supreme Court of New Hampshire:

---

[10] In Hufanga, we held there was sufficient foundation to admit video evidence under HRE Rule 901(b)(1) where a witness testified he owned the video recording system, testified that it was functioning properly at the time in question, and testified "as to the recordings' accurate representation of the locations, furniture, and people present" on the date of the recording. Hufanga, 2019 WL 1487047, at *5. In Hays, the Supreme Court of the Territory of Hawai'i held that the trial court erred in refusing to admit photographs because, although the person who took the photographs was not present to testify, there was testimony by a witness who lived near the premises where the alleged offenses had occurred and was familiar with the premises during the time of the alleged offenses, who testified to the effect that the photographs "were fair, correct and accurate representations of the geographical situation" in the year of the alleged offenses. Hays, 43 Haw. at 65.

> When presented with authentication challenges to the admissibility of video tapes or other recordings, courts have typically admitted such evidence on one of two grounds. First, courts admit such evidence when it is introduced to illustrate the testimony of a witness who observed the same scene viewed by the recording equipment. <u>Second, where there is no first-hand witness, courts have adopted the "silent witness" theory to admit video recordings</u>. The "silent witness" theory allows for the introduction of the recording as primary, substantive evidence of the events depicted. <u>Under this theory, a witness need not testify to the accuracy of the image depicted in the photographic or videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation</u>. In such a case, the evidence is received as a so-called silent witness or as a witness which speaks for itself.

<u>State v. Stangle</u>, 97 A.3d 634, 637 (N.H. 2014) (emphases added) (citations and some internal quotation marks omitted). <u>See also</u> <u>United States v. Harris</u>, 55 M.J. 433, 438-39 (C.A.A.F. 2001) (applying Rule 901(b)(9) of the Military Rules of Evidence to a "freeze frame" from videotape and noting that the "silent witness" theory of authentication has been developed in many jurisdictions "to allow photographs to substantively 'speak for themselves' after being authenticated by evidence that supports the reliability of the process or system that produced the photographs" (citation omitted)); <u>State v. Haight-Gyuro</u>, 186 P.3d 33 (Ariz. Ct. App. 2008); <u>People v. Dennis</u>, 956 N.E.2d 998 (Ill. App. Ct. 2011); <u>Kindred v. State</u>, 524 N.E.2d 279 (Ind. 1988); <u>State v. Moyle</u>, 532 S.W.3d 733 (Mo. Ct. App. 2017); <u>State v. Anglemyer</u>, 691 N.W.2d 153 (Neb. 2005); <u>State v. Snead</u>, 783 S.E.2d 733 (N.C. 2016); <u>People v. Tuncap</u>, No. CRA 12-032, 2014 WL 235471 (Guam Jan. 16, 2014); 2 George E. Dix et al., <u>McCormick On Evidence</u> § 216, at 39-40 (Kenneth S. Broun ed., 7th ed. 2013) (noting that "[r]ecordings such as a tape from an automatic surveillance camera can be authenticated as the accurate product of an automated process, the foundation required by Federal Rule of Evidence 901(b)(9)" (footnote omitted)).

Some jurisdictions have adopted various multi-factor tests for determining the admissibility of photographs or videos under the "silent witness" theory, while other jurisdictions have adopted a less formulaic approach that focuses on the facts of each case, reasoning that "it is not wise to establish specific

foundational requirements for the admissibility of photographic or video evidence under the 'silent witness' theory, since the context in which the . . . evidence was obtained and its intended use at trial will be different in virtually every case." Stangle, 97 A.3d at 638 (ellipses in original) (citation, brackets, and some internal quotation marks omitted). Under this approach, "[i]t is enough to say, that adequate foundational facts must be presented to the trial court, so that the trial court can determine that the trier of fact can reasonably infer that the subject matter is what its proponent claims." Id. (citation and internal quotation marks omitted).

We agree with those jurisdictions, including New Hampshire in Stangle, that have adopted a less formulaic approach to the "silent witness" theory of authentication. See, e.g., Haight-Gyuro, 186 P.3d at 37 (adopting a "flexible approach" of the silent witness theory allowing a trial court "to consider the unique facts and circumstances in each case" in determining whether the photographic or video evidence was properly authenticated); Kindred, 524 N.E.2d at 298 (declining to require extensive, absolute foundation requirements under the silent witness theory, so long as the foundation provides a strong showing of the photograph's competency and authenticity based on the facts and circumstances of the case); Anglemyer, 691 N.W.2d at 160 (noting that under the silent witness theory, photographic evidence may be authenticated by evidence "which supports the reliability of the photographic product", including the validity of the photographic process (citations omitted)); see also Snead, 783 S.E.2d at 736 (holding that "[e]vidence that the recording process is reliable and that the video introduced at trial is the same video that was produced by the recording process is sufficient to authenticate the video and lay a proper foundation for its admission as substantive evidence" (citations omitted)).

In our view, the approach taken in Stangle and other similar cases is consistent with the general requirements under HRE Rule 901(a), that "[t]he requirement of authentication or

identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." As noted in the rule, HRE Rule 901(b) provides for illustration purposes, and without limitation, "examples of authentication or identification conforming with the requirements of this rule[.]" Thus, we agree with Stangle that under the "silent witness" theory, "adequate foundational facts must be presented to the trial court[] so that the trial court can determine that the trier of fact can reasonably infer that the subject matter is what its proponent claims." Stangle, 97 A.3d at 638 (citation and internal quotation marks omitted). This standard is, ultimately, the standard articulated under HRE Rule 901(a).

Once a trial court, in its discretion, has determined that the proponent for admitting surveillance videos under the "silent witness" theory has established sufficient foundational facts for admission, concerns that an opposing party may have such as the surveillance procedures, or the method of storing and reproducing video material, is properly subject to cross-examination and affects the weight, not the admissibility of such evidence. Id. at 639. Accordingly, an opposing party can cross-examine a witness on potential problems with the surveillance system and the possibility that the video could have been altered, or even highlight that the witness did not personally install or maintain the surveillance cameras. Id. Such inquiries affect the weight of the evidence, and not its admissibility. Id.

Here, Luke objected to admitting the Shimoda Videos based on "[f]oundation, confrontation, hearsay, State v. Manewa, [and] State v. Assaye[,]" and the Circuit Court simply sustained the objection without comment. From our review of the record, however, it appears that the Circuit Court was not convinced that Shimoda was competent to testify that his home security system was operating properly on the day of the incident. In the HRE Rule 104 hearing, when the prosecutor asked Shimoda whether his

surveillance system was operating properly on the day of the incident, the Circuit Court continually sustained Luke's objections on the basis of lack of foundation. The Circuit Court declined the prosecutor's request to further elaborate on the basis of its ruling, but indicated that it would incorporate "the same ruling previously when we were dealing with Mr. Yamamoto's testimony."

At the HRE Rule 104 hearing for the Yamamoto Video, the Circuit Court specifically noted the importance of Yamamoto's testimony on the e-mail alerts he received on the day of the incident in establishing the reliability of the system. The court explained:

> The court is mindful of the fact that <u>despite the defense's arguments that this evidence is akin to evidence that is the result of some sort of a measuring device</u>, like the analytical balance in . . . the Manewa and the Wallace decisions, <u>basically at its core, what it is is simply a video from a system that was installed by this witness</u>. This witness is certainly no expert in the design, the maintenance, or any of the other particulars relating to the videotape surveillance system. <u>But what he does know is that when -- on occasion when he gets alerts -- and I'm referring specifically to the date of the offense</u> -- at one point, when his wife goes out, he goes out, that he receives an alert that that was consistent with movement within the back yard area which is where the one and only camera is stored.
>     I would note that <u>in terms of establishing the reliability of the system that what the court finds to be of particular importance is the testimony that relates to the attempted burglary itself, when the witness is at his desk or on a conference call, receives an alert, goes to the door after having received the alert with the accompanying video -- the still photograph, looks out the window, and sees the individual that is the same or appears to be the same individual in the video still. And that to me is sort of at the core of the inquiry</u>. And so for that reason, the court is going to respectfully overrule the objections raised by the defense and would disagree that the objections and concerns raised are not more appropriately addressed to the weight of the evidence as opposed to the admissibility.

(Emphases added).

In admitting the Yamamoto Video, the Circuit Court disagreed with Luke's characterization of the security system as being akin to a "measuring device" as discussed in <u>Manewa</u>, and acknowledged that Yamamoto was not an expert as to the design and maintenance of the system. Instead, the Circuit Court noted that Yamamoto had installed his video system. Further, the Circuit

24

Court explicitly credited Yamamoto's ability to establish the reliability of the security system through his own personal knowledge of what the system had recorded on the day of the incident (i.e. that he was able to verify the accuracy of the recording of an individual in his yard with his own subsequent observation of the same individual in his yard), which the court stated was the "core of the inquiry". By incorporating its ruling on the Yamamoto Video into its analysis regarding the Shimoda Videos, we infer that the Circuit Court found that Shimoda could not testify to his security system's reliability on the day of the incident either because Shimoda lacked personal knowledge of the events that were recorded, or he lacked technical knowledge of the operation of the system because he was not the one who installed the system. We conclude, however, that neither type of testimony was required as foundation to admit the Shimoda Videos under HRE Rule 901(b)(9) and the "silent witness" theory.

The fact that Shimoda did not personally observe the events that his security system recorded on the day of the incident did not disqualify him from being able to authenticate the video under HRE Rule 901(b)(9) and the "silent witness" theory.[11] See Stangle, 97 A.3d at 636-37. The Circuit Court should have admitted the Shimoda Videos so long as Shimoda could provide "adequate foundational facts . . . so that the trial court can determine that the trier of fact can reasonably infer that the subject matter is what its proponent claims." Id. at 638 (citation and internal quotation marks omitted); HRE Rule 901(a).

Here, Shimoda testified that the security system at his home was installed by a company named Cam Security in 2013, and that Cam Security was called for maintenance two times prior to the alleged offenses in April 2015. Shimoda also testified to

---

[11] Personal observation of the events in the video recordings would have allowed Shimoda to provide foundation under HRE Rule 901(b)(1), similar to Hufanga. See Hufanga, 2019 WL 1487047, at *4-5.

his understanding of the intricacies of his security system as a user, including the number of cameras installed on his property, the view planes each camera recorded, that it runs and is recording "24/7, 365 days a year", the process for viewing the footage recorded by the cameras, and indicators for when the system was not operating properly. Shimoda testified that from the last time Cam Security did maintenance service on his security system in January 2014, until the date of the alleged incident in April 2015, he had not experienced any problems with the system.

On the date of the incident, Shimoda testified that three of the four cameras were functioning during the day. Shimoda explained that he knows when one of the cameras is not working because the screen on the monitor will be blank or blue, and that typically the camera that was off on the day of the incident goes off in the daytime because it is outside, the sun is on it, and it is too bright. Given the three working cameras on the day of the incident, Shimoda testified regarding his observations of the footage he viewed on the security system on the day of the incident, which he viewed along with several police officers and some family members. Shimoda testified that he played the video from the time he left earlier that day, and that the video is date and time-stamped. Shimoda further testified that the video showed a person enter the property at about 11:20 a.m. and Shimoda described the person as wearing shorts and a jacket, that the person was carrying a backpack and a helmet, that the person proceeded to the back of the house, and that at about 11:50 a.m., the recording showed the same person "leaving the front door with my black suitcase which I last saw when I left for work." Shimoda confirmed that the individual had not been holding the black suitcase when he had entered the property.

Shimoda also testified that he contacted a Cam Security technician, who came out that afternoon and downloaded the video from the security system to a thumb drive covering the time

period from "about 11:18 to about 11:55". Shimoda testified that he provided the thumb drive to HPD, that prior to trial he had viewed copies of the footage he had provided to HPD on the day of the incident, and he confirmed that the copies he viewed -- on disks identified as State's exhibit 2 and 2a -- were "exact copies" of what he viewed on his monitor the day of the incident.

Given the record in this case, we conclude the Circuit Court erred in its analysis regarding whether to admit the Shimoda Videos. The record reflects that Shimoda provided detailed testimony about the operation of his home security system, his familiarity with the system, the past maintenance of the system, that Shimoda had not encountered any problems since the last maintenance service, that the system provided a date and time stamp on the videos, that Shimoda could operate the system to view the recording on the day of the incident, the details of what Shimoda saw in reviewing the videos that day, that he then contacted a Cam Security technician the day of the incident to download the videos provided to HPD, and that he confirmed State's exhibits 2 and 2a were exact copies of what he viewed on his monitor the day of the incident.[12] Given such evidence, we believe it was well within the discretion of the Circuit Court to determine that the State had provided sufficient foundation to admit the Shimoda Videos under HRE Rule 901.[13] We also note that the Circuit Court precluded the prosecutor's multiple attempts to

---

[12] We note that, although the Circuit Court did not expressly address Manewa and Assaye with regard to the Shimoda Videos, the court had previously distinguished those cases when ruling on the Yamamoto Video, expressing that those cases dealt with measuring devices. We similarly conclude that Manewa and Assaye are distinguishable because they dealt with highly technical measuring instruments, an analytic balance in Manewa that measured the weight of methamphetamine and a laser gun in Assaye used to determine the speed of a vehicle. The rulings in Manewa and Assaye were not based on HRE Rule 901.

[13] It is unclear from the record whether the Circuit Court viewed the Shimoda Videos before ruling they were inadmissible. In this regard, we simply note that in Loevsky v. Carter, the Hawai'i Supreme Court stated that "[w]here the admissibility of the contents of a visual recording is at issue in a judicial proceeding, we direct that Hawaii trial courts in the future undertake their best efforts in attempting to view the subject visual recording prior to ruling on its admissibility." 70 Haw. 419, 423 n.6, 773 P.2d 1120, 1123 n.6 (1989) (citation omitted).

ask Shimoda whether he believed his security system was operating properly on the day of the incident. In this regard, the State's effort to establish further foundation was thwarted.

The fact that Shimoda did not observe in person the events that were recorded on the videos, and that he did not install or service the security system himself, were not fatal obstacles to admission of the Shimoda Videos. Such factors could have been raised in cross-examination and affected the weight of the video evidence, and not admissibility. See Stangle, 97 A.3d at 639.

### C. Dismissal With or Without Prejudice: Moriwake Factors

The State asserts that the Circuit Court was wrong in its COLs 5, 7, 8, 9, 10, and 12 in the Dismissal Order, which pertain to the court's evaluation of the Moriwake factors and whether to dismiss with prejudice.

The Hawai'i Supreme Court has recognized the inherent authority of a trial court to dismiss an indictment with prejudice within the bounds of its duly exercised discretion. Moriwake, 65 Haw. at 55-57, 647 P.2d at 711-713; Deedy, 141 Hawai'i at 224, 407 P.3d at 180. "In making a determination as to whether to dismiss an indictment, the role of a trial court is to balance the interest of the state against fundamental fairness to a defendant with the added ingredient of the orderly functioning of the court system." Deedy, 141 Hawai'i at 224, 407 P.3d at 180 (quoting Moriwake, 65 Haw. at 56, 647 P.2d at 712)(internal quotation marks omitted).

The factors that the trial court should consider in maintaining this balance include:

> (1) the severity of the offense charged; (2) the number of prior mistrials and the circumstances of the jury deliberation therein, so far as is known; (3) the character of prior trials in terms of length, complexity and similarity of evidence presented; (4) the likelihood of any substantial difference in a subsequent trial, if allowed; (5) the trial court's own evaluation of relative case strength; and (6) the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney.

Moriwake, 65 Haw. at 56, 647 P.2d at 712-13 (citation omitted).

"Nothing in Moriwake indicates that all factors must be given equal weight or that certain factors must be given more weight than others." Deedy, 141 Hawai'i at 224, 407 P.3d at 180 (internal quotation marks omitted) (quoting Hinton, 120 Hawai'i at 280, 204 P.3d at 499). In reviewing the trial court's exercise of discretion in dismissing a case with prejudice, we "accord deference to the conclusion of the trial court[.]" Moriwake, 65 Haw. at 56, 647 P.2d at 712 (citation omitted). "We will not vacate a trial court's Moriwake ruling unless the party challenging the ruling can make a strong showing that the court abused its discretion by clearly exceeding the bounds of reason or disregarding rules or principles of law or practice." Deedy, 141 Hawai'i at 224, 407 P.3d at 180 (citations omitted).

In this case, the following are the pertinent conclusions in the Dismissal Order, including some that the State does not challenge:

5. As to factor 1, severity of the offense: The Court has considered the severity of the offenses charged in this case and finds that although B class felonies are serious, the charged offenses did not involve violence and were not as serious as the types of charges in Hinton or Moriwake, so this factor is neutral, favoring neither dismissal or retrial.

6. As to factor 2, number of prior mistrials: Although the prior mistrial was caused by the State, there has only been one mistrial, so this factor favors a retrial.

7. As to factor 3, the character of prior trials in terms of length, complexity, and similarity of evidence presented: In the trial the State struggled to lay foundation for the video evidence and to admit the Defendant's statements, with long and fruitless hearings on the Shimoda videos and the voluntariness of the Defendant's statements, and this factor favors a dismissal.

8. As to factor 4, the likelihood of any substantial difference in a subsequent trial: This factor favors a retrial, because the State may be able to lay foundation for the Shimoda videos in a new trial. However, the Court acknowledges the Defense arguments that it would be unfair to reward the State with another chance to lay foundation, when it was the State's conduct that caused the mistrial.

9. As to factor 5, the relative case strength: The Court finds that the State's case in the first trial was not very strong because of its inability to introduce the Shimoda videos, and this factor favors dismissal;

29

10.    As to factor 6, the professional conduct and diligence of the attorneys: The Court found this factor to weigh most heavily against a retrial and for dismissal, and noted that the Prosecuting Attorney did not act diligently in this trial, particularly given his many years of experience. The State seemed unprepared to present its evidence and it <u>struggled throughout with laying foundation</u>. The State did not present sufficient evidence to support the drug charges in this case. Furthermore, the State should absolutely not have made the rebuttal arguments that caused the mistrial, as they were clearly in violation of the Motions in Limine and the Court's ruling after the voluntariness hearing. There were other ways to respond to the Defense argument that would not involve introducing new evidence or violating Court rulings. Additionally, if the State had approached prior to rebuttal argument and asked the Court to find that the Defense had opened the door somehow for the State to introduce evidence in its closing argument that the Defendant made statements or was the origin of the Cousin Jeff information, or that the Defendant's statements were not worthy of belief, the Court would have absolutely prohibited the State from doing so. Considering that the Court's rulings on the evidence were clear and made close in time to the State's violation, the fact that the Prosecutor has a great deal of experience and should have known better, and the late stage in the case at which the State's conduct occurred, the State's lack of diligence and/or professionalism in this case causes the Court to strongly favor a dismissal over a retrial in analyzing this factor.

. . .

12.    Based on the Findings of Fact and Conclusions of Law above, this court concludes that the <u>Moriwake</u> factors support a dismissal of all remaining charges with prejudice in order to ensure fundamental fairness to the Defendant, and so the Motion to Dismiss with Prejudice should be GRANTED.

(Emphasis added).

We fully recognize the deference to be given to the trial court in making a <u>Moriwake</u> ruling. However, as set forth in its conclusions in evaluating the <u>Moriwake</u> factors, the Circuit Court relied heavily on the State's inability to admit the Shimoda Videos into evidence to justify its decision to dismiss the case with prejudice.[14] Given our discussion above regarding the Shimoda Videos, we conclude the Circuit Court

---

[14] The Circuit Court's conclusions are stated at times in terms of dismissal or retrial. It appears that when the court used the term "dismissal" it meant dismissal with prejudice.

abused its discretion in dismissing Counts I, II, and III with prejudice for the reasons it articulated.

In its COL pertaining to the third <u>Moriwake</u> factor -- the character of prior trials in terms of length, complexity and similarity of evidence presented -- the Circuit Court concluded that the State had struggled to admit evidence to support its case, including to lay foundation for the Shimoda videos, which favored dismissal.

While the Circuit Court stated that the fourth <u>Moriwake</u> factor -- the likelihood of any substantial difference in a subsequent trial, if allowed -- favored retrial, it acknowledged Luke's "arguments that it would be unfair to reward the State with another chance to lay foundation [for the Shimoda Videos], when it was the State's conduct that caused the mistrial."

The Circuit Court concluded that the fifth <u>Moriwake</u> factor -- the trial court's evaluation of relative case strength -- favored dismissal because of the State's inability to introduce the Shimoda videos[.]"[15]

Finally, as to the sixth <u>Moriwake</u> factor -- the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney -- the Circuit Court focused primarily on the prosecutor's conduct in rebuttal closing argument which caused the mistrial, but the court also expressed concern that the State "seemed unprepared to present its evidence and it struggled throughout with laying foundation."

It is apparent from the Dismissal Order and the record that the Circuit Court was concerned that allowing a retrial would be unfair to Luke because the State would be given another opportunity to lay foundation for the Shimoda Videos when the State had failed to do so to the court's satisfaction in this trial. After it had declared a mistrial, the Circuit Court specifically commented that if it were to permit a retrial in

---

[15] We note that the Shimoda Videos relate to Count II (Burglary) and Count III (Unauthorized Possession of Confidential Personal Information), but not to Count I (Attempted Burglary).

this case, it would potentially benefit the State because it might then be able to admit the Shimoda Videos, despite the State having caused the mistrial. Further, at the hearing on the Motion to Dismiss, the Circuit Court noted that Luke was essentially forced to move for mistrial despite "knowing that the state of the evidence certainly wasn't the most compelling case that the State could have made based upon the available information", in reference to the Shimoda Videos. The Circuit Court also noted that with the videos "it's a strong case[,]" but without the Shimoda Videos "the case chased [sic] on an entirely different complexion", leading the court to conclude that the fifth Moriwake factor favored dismissal.

Given our conclusion above that the Circuit Court erred in its analysis in precluding the Shimoda Videos, we further conclude the Circuit Court abused its discretion in dismissing this case with prejudice for the reasons it relied upon. Given our discussion about the foundation needed for admissibility of the Shimoda Videos, any perceived unfairness caused to Luke from a retrial is not as severe, because there was sufficient evidence presented by the State for the Circuit Court to have admitted the Shimoda Videos. Thus, the Circuit Court's reasoning in analyzing the Moriwake factors was incorrect.

Based on the above, we conclude the Circuit Court abused its discretion in entering the Dismissal Order. We remand this case to the Circuit Court for further consideration of the Moriwake factors in light of this opinion. See State v. Sasai, 143 Hawaiʻi 285, 299-300, 429 P.3d 1214, 1228-29 (2018) (remanding case to the district court for application of appropriate factors and to make findings regarding whether charges should be dismissed with or without prejudice); State v. Hern, 133 Hawaiʻi 59, 65, 323 P.3d 1241, 1247 (App. 2013) (remanding case to the trial court to make appropriate findings whether to dismiss criminal charge with or without prejudice).

## IV. Conclusion

The "Findings of Fact, Conclusions of Law, and Order Granting Defendant's Motion to Dismiss with Prejudice", filed by the Circuit Court on November 25, 2015, is vacated. This case is remanded to the Circuit Court for proceedings consistent with this opinion.


On the briefs:

James M. Anderson,
Deputy Prosecuting Attorney,
for Plaintiff-Appellant.

Phyllis J. Hironaka,
Deputy Public Defender,
for Defendant-Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Alexa D.M. Fujise
Associate Judge

/s/ Derrick H.M. Chan
Associate Judge